UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSOCIATED DOG CLUBS OF NYS, ET AL.,

                              Plaintiffs,

         v.                                                     CASE NO. 1:13-CV-1982 (RLW)

VILSACK

and

UNITED STATES DEPARTMENT OF AGRICULTURE

                              Defendants,

and

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, NW
Washington, DC 20037

                    Proposed-Intervenor-Defendant.


**MOTION TO INTERVENE OF**
**THE HUMANE SOCIETY OF THE UNITED STATES**


        The Humane Society of the United States ("The HSUS" or "HSUS") hereby respectfully

moves to intervene in this matter as a party defendant.

        As explained further in the accompanying Points and Authorities, this matter involves a

Final Rule, 78 Fed. Reg. 57,227 (Sept. 18, 2013), issued by the United States Department of

Agriculture ("USDA") pursuant to the rulemaking authority granted to the agency by the Animal

Welfare Act ("AWA"). 7 U.S.C. § 2331, *et seq.*.  The AWA and the Final Rule at issue are

critical animal protection measures that are invaluable to The HSUS's longstanding work of

improving the lives of animals bred to be pets and in combating inhumane puppy mills.  The

Final Rule is the culmination of years of effort on the part of The HSUS to bring about meaningful change to existing law.  If Plaintiffs are successful in their efforts to set aside the Final Rule, The HSUS will suffer immediate and concrete harm.  As such, and pursuant to Fed. R. Civ. P. 24(a)(2), The HSUS is entitled to intervene in this matter as of right to protect its interests and rights as they relate to the work that is central to the organization's mission.  In the alternative, The HSUS requests that it be allowed to permissively intervene under Fed. R. Civ. P. 24(b).

Pursuant to Local Rule 7(m), The HSUS attempted to confer with both parties regarding this Motion.  Counsel for Plaintiffs informed the undersigned that they would not consent to this Motion; this matter does not yet appear to have been assigned to an attorney with the Department of Justice and the undersigned was unable to receive consent or opposition from Defendants.

Date:  Dec. 30, 2013

Respectfully Submitted,

   /s/  Aaron D. Green
Aaron D. Green  (D.C. Bar No. 1015611)*
agreen@humanesociety.org
Jonathan Lovvorn (D.C. Bar No. 461163)
jlovvorn@humanesociety.org
The Humane Society of the United States
2100 L Street, NW
Washington, DC  20037
Ph. (202) 676-2334
Fax. (202) 676-2357

*Attorneys for Proposed-Intervenor-Defendant*
*The Humane Society of the United States*

*\* swearing-in to this Court expected in Jan. 2014.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSOCIATED DOG CLUBS OF NYS, ET AL.,

Plaintiffs,

v.

VILSACK

and

UNITED STATES DEPARTMENT OF AGRICULTURE

Defendants,

and

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, NW
Washington, DC 20037

Proposed-Intervenor-Defendant.

CASE NO. 1:13-CV-1982 (RLW)

**POINTS AND AUTHORITIES IN SUPPORT OF
THE HUMANE SOCIETY OF THE UNITED STATES' MOTION TO INTERVENE**

The Humane Society of the United States ("The HSUS" or "HSUS") respectfully requests that this Court grant its request to intervene in this matter as of right pursuant to Fed. R. Civ. P. 24(a)(2) or, in the alternative, grant permissive intervention pursuant to Fed. R. Civ. P. 24(b). This motion is timely as it is being filed only 14 days after Plaintiffs filed their Complaint [Dkt. 1], and The HSUS's interests are not adequately represented by an existing party. As explained herein, this lawsuit is challenging the revision of an important animal protection regulation which closes a loophole that previously allowed commercial breeders selling pets over the Internet to escape Federal oversight under the AWA. The closure of this loophole is critical

to The HSUS's mission to protect animals bred to be pets, and allows the nonprofit organization to utilize its resources that were previously diverted to tracking, reporting on, and responding to emergency raids at the facilities of unlicensed breeders who were taking advantage of the loophole.  If Plaintiffs are successful in their attempts to set aside the new rule, The HSUS will suffer immediate, concrete and perceptible harm.

I.      BACKGROUND

    **A. The Humane Society of the United States and its Campaign to end Puppy Mills.**

The HSUS is the nation's largest animal protection organization.  Since its founding in 1954, The HSUS has worked for the protection of all animals through advocacy, education, and direct animal care.  Throughout its existence, The HSUS has worked to eliminate and ensure the proper oversight and regulation of large-scale inhumane commercial breeding facilities, commonly referred to as puppy mills.  In a puppy mill, profit is emphasized over the welfare of the dogs, with breeding dogs often spending their entire lives in small, wire cages where they receive inadequate and unclean food and water, and often little to no veterinary care.  Breeding dogs in puppy mills are normally bred every heat cycle and when they can no longer breed, they are typically discarded or killed.

One way that The HSUS works to crack-down on the pernicious scourge of unscrupulous dog dealers is to regularly seek legislative and regulatory changes on the local, state and Federal level. The HSUS also undertakes educational efforts intended to combat the proliferation of puppy mills.  One manner of these efforts is for The HSUS to obtain USDA inspection reports of AWA-licensed facilities so that the organization can alert its membership and the public at large to the existence of these substandard breeding facilities.  *See*, e.g., The HSUS, "HSUS Releases

4

Update    on    Missouri's    Worst    Puppy    Mills," Mar.   9,   2011,

http://www.humanesociety.org/news/press_releases/2011/03/dirty_dozen_puppy_mills_030911.

html#.UrsWs_RDuSo.

The HSUS also has considerable expertise in responding to large-scale cruelty situations,

and as a result has often been called upon by law enforcement to assist in raids of puppy mills

and other substandard breeding facilities.  Parascandola Decl. ¶¶ 3-7 [Ex. A].  *See, e.g.,* Tracie

Letterman, "The HSUS Comments to USDA in Support of "Retail Pet Store" Definition

Change," ("The HSUS Comments") at Attachment  C pg. 5 ("Over the past 6 years, The HSUS

has assisted in removing more than 8,000 dogs and puppies from substandard breeding facilities

where the animals were found suffering in unsanitary, overcrowded and inhumane conditions

[and a]lmost all of the facilities were selling the dogs over the internet or by mail, and were not

licensed by the USDA.") [Ex. B].  Following these raids, which have all taken place at facilities

that are *not licensed* by the USDA, The HSUS must divert significant resources to the care of the

seized animals, with total amounts sometimes rising into the tens-of-thousands of dollars range.

*Id.* at 5-6.  Since 2009 alone, The HSUS has expended well over $1.296 million-dollars in the

response, rescue and care of animals from non-USDA-licensed breeders across the country.

Parascandola Decl. ¶ 6 [Ex. A].

### B.  The Animal Welfare Act

In 1966, Congress passed the Laboratory Animal Welfare Act.  Pub. L. No. 89-544, 80

Stat. 350 (1966).  The law was the culmination of many years of hard work by animal advocates,

including The HSUS,[1] to address a nationwide scourge of unscrupulous dog dealers who were

---

[1]   In 1996, Life magazine published a story about the raid of a Maryland based dog dealer.  Law
enforcement, accompanied by Frank McMahon, chief investigator for The HSUS, found skeletal

selling lost or even stolen dogs to be used in research labs.  Since then, the Act has been strengthened through a series of amendments.  It was amended in 1970 and renamed the Animal Welfare Act ("AWA"), reflecting the growing number of animals and activities brought under the ambit of the law.  Pub. L. No 91-579, 84 Stat. 1560 (1970). These amendments expanded the coverage of the statute to include dealers of animals sold for use as pets and established "by law the humane ethic that animals should be accorded basic creature comforts of adequate housing, ample food and water, reasonable handling, decent sanitation, sufficient ventilation, shelter from extremes of weather and temperature, and adequate veterinary care..." H.R. Rep. No. 91-1651 (1970), 91st Cong. 2d Sess. 1970, *reprinted in* U.S.C.C.A.N. 5103, 5104.

Through the AWA, Congress directed USDA to "insure that animals intended for use…as pets are provided humane care and treatment." 7 U.S.C. § 2131.  To that end, all pet "dealers" must have a license issued by USDA in order to sell, transport or buy animals.  7 U.S.C. § 2134.  The AWA defines "dealer" to mean "any person who, in commerce, for compensation or profit… buys, or sells, or negotiates the purchase or sale of, [ ] any dog or other animal… for research, teaching, exhibition, or use as a pet" but the term excludes "a retail pet store except such store which sells any animals to a research facility, an exhibitor, or a dealer." 7 U.S.C. § 2132.  The AWA does not define "retail pet store." *Id.*

Pursuant to its rulemaking authority, 7 U.S.C. § 2151 (USDA may "promulgate such rules, regulations, and orders as [it] may deem necessary in order to effectuate the purposes of" the AWA), the agency promulgated regulations to implement the AWA with which all dealers

---

dogs that were destined for research laboratories.   The public outrage led to the passage of the Laboratory Animal Welfare Act shortly thereafter. *See* "Concentration Camps for Dogs," LIFE, Feb 4, 1966 at 22 (accessible at http://books.google.com/books?id= JkwEAAAAMBAJ&lpg=PA1&pg=PA1#v).

regulated by the AWA must comply.  9 C.F.R. § 1.1, *et seq*., C.F.R. T. 9, Ch. I, Subch. A, Pts. 1-3.  AWA regulations cover everything from exercise requirements for dogs, 9 C.F.R. § 3.8, to minimally accepted feeding practices, 9 C.F.R. § 3.9, provision of drinking water, 9 C.F.R. § 3.10 and standards for cleaning, sanitization, and pest control.  9 C.F.R. § 3.11.  In addition, USDA originally promulgated the following definition of "retail pet store":

> "Retail pet store means any outlet where only the following animals are sold or offered for sale, at retail, for use as pets: Dogs, cats, rabbits, guinea pigs, hamsters, gerbils, rats, mice, gophers, chinchilla, domestic ferrets, domestic farm animals, birds, and coldblooded species. Such definition excludes--
>
> > (1) Establishments or persons who deal in dogs used for hunting, security, or breeding purposes;
> > (2) Establishments or persons exhibiting, selling, or offering to exhibit or sell any wild or exotic or other nonpet species of warmblooded animals (except birds), such as skunks, raccoons, nonhuman primates, squirrels, ocelots, foxes, coyotes, etc.;
> > (3) Any establishment or person selling warmblooded animals (except birds, and laboratory rats and mice) for research or exhibition purposes; and
> > (4) Any establishment wholesaling any animals (except birds, rats and mice).
> > (5) Any establishment exhibiting pet animals in a room that is separate from or adjacent to the retail pet store, or in an outside area, or anywhere off the retail pet store premises."  9 C.F.R. § 1.1 (2012).

The agency interpreted this definition to include essentially *any* pet breeder or retailer who sold animals directly to the public, regardless of whether those sales took place from a breeder's home, a traditional brick-and-mortar pet store, or, as became highly relevant more recently, sight-unseen over the Internet.  *See DDAL v. Veneman,* 315 F.3d 297 (D.C. Cir. 2003); *see also* 62 Fed. Reg. 14,044 (Mar. 25, 1997).

### C.   Development of the Final Rule and New Definition.

In 1997, as a result of a rulemaking petition filed by Doris Day Animal League ("DDAL")–which later became, and still is, an affiliated organization of Proposed-Intervenor-

Defendant The HSUS–USDA solicited public comments on DDAL's request to narrow the definition of "retail pet store" to ensure that the numerous commercial breeders selling dogs directly out of their homes and over the Internet would be regulated.  62 Fed. Reg. 14,044 (Mar. 25, 1997).   Despite considerable public interest in amending the rule, USDA declined to change the term's definition.  64 Fed. Reg. 38,546 (July 19, 1999).   As a result, DDAL sued USDA alleging that the agency's broad definition of retail pet store was inconsistent with the AWA, but was ultimately unsuccessful.  *See DDAL,* 315 F.3d 297.   Accordingly, until USDA promulgated the Final Rule at issue in this case, thousands of breeders selling directly to the public were able to escape critical regulation and oversight under the AWA because of the broad "retail pet store" exemption.

Meanwhile, in the following decades, the use of the internet as an avenue for puppy-sales proliferated, allowing thousands of breeders to sell their puppies online directly to customers throughout the country, without any oversight from the USDA, and without the customer ever having an opportunity to see where the puppies were bred.  This situation allowed unscrupulous, inhumane breeders to fly under the regulatory-radar and sell puppies to unwitting customers taken in by photos of adorable animals on a glossy website.  And because the customers buying over the internet never see the facility where their puppy is bred, the breeder could easily misrepresent the nature and quality of the breeding program and the manner in which the breeding dogs and puppies are treated.   Indeed, The HSUS has gathered considerable information demonstrating that unlicensed breeders selling over the Internet frequently are raising dogs in horrific conditions with inadequate food and water and little or no veterinary care. *See, e.g.,* Attachment C to The HSUS Comments [Ex. B].

Unfortunately, the puppies bred in the substandard conditions present in many unlicensed facilities are often sick with congenital or hereditary diseases and contagious illnesses.  Many puppies from such inhumane breeding facilities – frequently referred to as "puppy mills" – even die shortly after they are shipped to their new owners.  The HSUS regularly receives complaints from people who purchased a sick puppy over the Internet from a non-USDA-licensed breeder.  *See* The Humane Society of the United States, "Puppy Buyer Complaints, A Five Year Summary," 2012, at 6, http://www.humanesociety.org/assets/pdfs/pets/puppy_mills/ puppy_mill_buyer_complaints.pdf (last visited Dec. 25, 2013) (Noting that 44% of all breeder/broker complaints received by The HSUS involved Internet transactions.).

In November 2011, The HSUS, along with other animal protection organizations, submitted a petition to the White House's "We the People" website which called for the Obama Administration to crack-down on puppy mills by "clos[ing] the current regulatory loophole" which would result in "large-scale, commercial breeders who sell puppies online and directly to the public to be covered by USDA's Animal Welfare Act regulations."  *Available at* https://petitions.whitehouse.gov/petition/crack-down-puppy-mills/B9W46NCH (last visited Dec. 25, 2013).  The petition received approximately 32,559 signatures and the White House responded that USDA planned to publish a "proposed rule covering Internet breeders in the Federal Register for public comment in 2012."  *Id.*

On May 16, 2012, USDA published a Notice of Proposed Rulemaking in which it announced its plan to revise the "definition of retail pet store and related regulations to bring more pet animals sold at retail under the protection" of the AWA.  77 Fed. Reg. 28,799.  During the course of this rulemaking, USDA collected 75,584 individual comments, 134,420 signed form letters and 213,000 signatures on petitions submitted by organizations either in favor or

opposition to the proposed rule.  The HSUS,[2] along with The Humane Society Legislative Fund, submitted extensive comments in support of the Proposed Rule, The HSUS Comments [Ex. B], and gathered more than 111,000 letters in support of the rule.  *See* http://www.regulations.gov/#!documentDetail;D=APHIS-2011-0003-15369;  *also,*  http://www. humanesociety.org/news/press_releases/2012/08/350000_voices_for_puppy_mills_081512.html (last visited Dec. 26, 2013).

On September 18, 2013, USDA published a Final Rule adopting a new definition of "retail pet store." 78 Fed. Reg. 57,227.  The new definition, which became effective November 18, 2013, is as follows:

> "Retail pet store means a place of business or residence at which the seller, buyer, and the animal available for sale are physically present so that every buyer may personally observe the animal prior to purchasing and/or taking custody of that animal after purchase, and where only the following animals are sold or offered for sale, at retail, for use as pets: Dogs, cats, rabbits, guinea pigs, hamsters, gerbils, rats, mice, gophers, chinchillas, domestic ferrets, domestic farm animals, birds, and coldblooded species. In addition to persons that meet these criteria, retail pet store also includes any person who meets the criteria in § 2.1(a)(3)(vii) of this subchapter. Such definition excludes--
>
>> (1) Establishments or persons who deal in dogs used for hunting, security, or breeding purposes;
>> (2) Establishments or persons, except those that meet the criteria in § 2.1(a)(3)(vii), exhibiting, selling, or offering to exhibit or sell any wild or exotic or other nonpet species of warmblooded animals (except birds), such as skunks, raccoons, nonhuman primates, squirrels, ocelots, foxes, coyotes, etc.;
>> (3) Any establishment or person selling warmblooded animals (except birds, and laboratory rats and mice) for research or exhibition purposes;
>> (4) Any establishment wholesaling any animals (except birds, rats, and mice); and

---

[2] Although not in agreement with the characterization of the statement, The HSUS notes that the attorney listed as "of counsel" on Plaintiffs' Complaint has declared  that "This "Rule" was actively orchestrated and supported by the Humane Society of the U.S…" http://memoryofchaucer.com/usda%20challenged.htm (last visited Dec. 26, 2013).

> (5) Any establishment exhibiting pet animals in a room that is separate from or adjacent to the retail pet store, or in an outside area, or anywhere off the retail pet store premises." *Id.*

The Final Rule also widened an existing exemption that is based upon the number of animals a breeder maintains on his or her premises. Under the expanded exemption, breeders are exempt from AWA licensing if they maintain four or fewer breeding females on their premises and sell only the offspring of those animals for use as pets or in exhibition. 78 Fed. Reg. 57,227 (Sept. 18, 2013).

Objecting to the new definition of "retail pet store," a cadre of approximately 39 unincorporated and incorporated dog clubs and breeder associations and three cat groups joined together and filed the instant case.

## II.    ARGUMENT

### A.  THE HSUS IS ENTITLED TO INTERVENE AS A MATTER OF RIGHT.

This court will grant a motion for intervention as of right under Fed. R. Civ. P 24(a)[3] when the following four requirements are satisfied: (1) the motion is timely, (2) the proposed intervenor demonstrates a "legally protected" interest, (3) a threat of impairment of that interest, and (4) the proposed intervenor is not adequately represented by existing parties. *See WildEarth Guardians v. Salazar*, 272 F.R.D. 4, 12-13 (D.D.C. 2010) (citing *Karsner v. Lothian*, 532 F.3d 876, 885-86 (D.C. Cir. 2008)). This Circuit has also required the intervening party to

---

[3] Fed. R. Civ. P 24(a) governs intervention and states, in pertinent part, that "[o]n timely motion, the court must permit anyone to intervene who... (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

demonstrate standing, which is normally encompassed within the second factor since "generally speaking, when a putative intervenor has a 'legally protected' interest under Rule 24(a), it will also meet constitutional standing requirements, and *vice versa.*"  *Id*. at 13, n.5.  As explained below, The HSUS readily satisfies each of these requirements.

<h3 style="text-align:center">i.      The Motion to Intervene is Timely.</h3>

Whether a motion to intervene is timely "is a context-specific inquiry" and courts should consider "the time elapsed since the inception of the action" along with the "probability of prejudice to those already party to the proceedings" as well as the purpose for intervention. *WildEarth Guardians*, 272 F.R.D. at 12 (citation omitted).  However, "[t]he critical factor is whether any 'delay in moving for intervention will prejudice the existing parties to the case.'" *Akiachak Native Cmty. v. U.S. Dept. of Interior,* 584 F. Supp. 2d 1, 5 (D.D.C. 2008) (citations omitted).

This motion is plainly timely.  The Complaint in this matter was filed only14 days ago, and neither Plaintiffs nor Defendants will be harmed by granting the motion at this stage in the litigation.  Indeed, this case "remains in its early stages: the administrative record is yet to be filed with the Court and no briefing schedule for dispositive motions has been set."  *WildEarth Guardians*, 272 F.R.D. at 15.  Moreover, the time for filing a responsive pleading has not even run. There can be no question that no party will be prejudiced by the admission of The HSUS into the case at this stage.

<h3 style="text-align:center">ii.      The HSUS Has Standing and a Legally Protected Interest Directly Threatened by this Matter.</h3>

The HSUS has standing and legally protected interests that are threatened by Plaintiffs' lawsuit.  If Plaintiffs are successful in setting aside the Final Rule, The HSUS will be directly

injured in several ways:  First, it will again be forced to divert resources to respond to animal cruelty emergencies at non-USDA licensed puppy mills selling to the public over the Internet; second, it will lose an efficient route of reporting and securing the response to animal cruelty by Federal authorities; and third, it will be deprived of critical sources of advocacy and educational information about commercial dog breeders.  Conversely, if the Court upholds the Final Rule, these injuries would be redressed.  *See People for the Ethical Treatment of Animals v. USDA*, --- F.Supp.2d ----, 2013 WL 6571845 (D.D.C. 2013) ("PETA").

Before Defendants published the Final Rule at issue here, The HSUS needed to devote and divert substantial organizational resources to locating, investigating, and bringing to justice numerous commercial breeders who were able to hide in the shadows because they were exempt from federal oversight as a result of the loophole created by the previously broad definition of retail pet store.  For example, in 2008, The HSUS was called-in to assist with the raid of a large unlicensed puppy mill in Lyles, Tennessee.  Attachment C to The HSUS Comments [Ex. B]. More than 700 dogs were rescued from "Pine Bluff Puppies" which sold puppies over the Internet and through classified ads and did not have a USDA license.  The six-day-long removal and treatment period for the animals cost The HSUS approximately $120,000—this figure does not include many additional other costs associated with the rescue including the "rental, medical issues and housing and meals for humans" working the rescue.  *Id.*  Similarly, in Parkersburg, West Virginia, over 900 dogs were rescued from Whispering Oaks Kennel, which did not have a USDA license because of the loophole that was closed by the Final Rule.  *Id*.  These are just two examples of the many raids and rescues at unlicensed commercial breeding facilities that The HSUS has been called upon to assist with–each one costing from thousands to upwards of hundreds-of-thousands of dollars.  Parascandola Decl. ¶ 6 [Ex. A]**.**

With the new definition of "retail pet store," USDA now has the regulatory means necessary to crack down on thousands of existing unscrupulous dog dealers.  Thus, if the Final Rule remains in place, it is highly likely that The HSUS would no longer have to engage in so many raids of unlicensed breeding facilities.  As a result, The HSUS will be able to use those otherwise diverted resources for its numerous critically important programs and activities intended to help animals in need.[4]  However, if the Rule is set aside, as Plaintiffs desire, The HSUS likely will again regularly be called upon to assist with raids of unlicensed, unregulated, unscrupulous breeders hiding in the shadows without any Federal oversight, and there will be an associated diversion of resources from HSUS's other programs.  This constitutes an injury-in-fact.  *See Humane Society of U.S. v. U.S. Postal Service,* 609 F.Supp. 2d 85, 91 (D.D.C. 2009) (Plaintiff-The HSUS suffered injury-in-fact because the need to care for seized animals on an emergency basis increased as a result of Agency's actions even if the exact date and location of the next animal fighting raid was unknown); *see also PETA,* 2013 WL 6571845 (Plaintiff animal protection organization suffered injury in fact when Agency refused to address plaintiff's complaints about animal abuse and failed to compile information plaintiffs needed which resulted in expending of additional resources).

The HSUS would also be directly injured in another discrete way should the Final Rule be set aside.  USDA established an online complaint system used to prevent cruelty and inhumane treatment of animals under the care and keeping of breeders covered by the AWA. Available at http://www.aphis.usda.gov/animal_welfare/aw_complaint_form.shtml (last visited Dec. 27, 2013).  With thousands more breeders now falling under the auspices of Federal

---

[4] The HSUS has a wide range of campaigns and programs related to farm animal welfare, wildlife, exotic animals, animals used in research and many others.

oversight, The HSUS can utilize this nearly costless avenue for reporting problematic breeders with the knowledge that the Federal government will investigate the matter, rather than being forced to expend additional resources by engaging local or state authorities or conducting its own costly investigations. *PETA,* 2013 WL 6571845.

Third, breeders who become licensed, or who apply for annual relicensing, are required to provide important information to the USDA concerning, among other things, the size of their operation. 9 C.F.R. § 2.1.[5] The HSUS collects and tracks this information to assist its Stop Puppy Mills campaign in understanding the effectiveness of USDA's AWA enforcement as well as the scope of the industry, location of the largest breeding facilities, and other important industry information—in fact, The HSUS is currently in litigation before the D.C. Circuit to defend its rights to this important information under the Freedom of Information Act. *Jurewicz v. USDA & HSUS*, D.C. Cir. Case No. 12-5331 (oral argument completed Nov. 15, 2013). Should Plaintiffs succeed in setting aside the Final Rule, The HSUS will lose access to this important information concerning the thousands of breeders who will now need to be licensed, and will need to undertake costly efforts to collect this information through other means. *PETA,* 2013 WL 6571845.

Finally, The HSUS is able to save money and resources in another key way due to the Final Rule. All licensees must undergo regular inspections by the USDA, resulting in inspection reports that the agency posts online. *Available at* https://acissearch.aphis.usda.gov/LPASearch/faces/Warning.jspx (landing page for USDA-APHIS online search of inspection reports) (last visited Dec. 25, 2013). The HSUS reviews and

---

[5] Pursuant to 9 C.F.R. § 2.127, USDA "publish[es] lists of persons licensed or registered in accordance with the provisions" of the AWA and [t]he lists may be obtained upon request from the AC Regional Director."

tracks these inspection reports to assist in its advocacy and education efforts, including by alerting consumers to potentially inhumane breeding facilities with a record of AWA violations. *See*, e.g., The HSUS, "HSUS Releases Update on Missouri's Worst Puppy Mills," (Mar. 9, 2011) http://www.humanesociety.org/news/press_releases/2011/03/dirty_dozen_puppy_mills_030911. html#.UrsWs_RDuSo.  If Plaintiffs are successful in this matter, The HSUS will lose an effective and efficient source of information concerning the thousands of breeders who must now become licensed as a result of the Final Rule.  In such case, The HSUS will be forced to expend organizational resources to seek out alternative sources of information concerning the breeders. *PETA*, 2013 WL 6571845.

There is no question that this action directly threatens The HSUS's interests.  If Plaintiffs are successful in setting aside the Final Rule, The HSUS will again suffer injuries.  Thus, The HSUS has standing and a legally protected interest which is directly threatened by Plaintiffs' lawsuit.

### iii.       No Existing Party Adequately Represents HSUS's Interest.

In determining whether an existing party adequately represents the movant's interests, "the putative intervenor's burden here is *de minimis*, and extends only to showing that there is a possibility that its interests may not be adequately represented absent intervention." *WildEarth Guardians*, 272 F.R.D. at 13 (citation omitted).  Here, "'[t]he applicant need only show that representation of his interest '*may be*' inadequate, not that representation *will* in fact be inadequate.'" *Hardin v. Jackson*, 600 F.Supp. 2d 13, 16 (D.D.C. 2009) (citations omitted) (emphasis added).  This Circuit has "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors," *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 737 (D.C. Cir. 2003), and such is the case here.

Defendants now find themselves in the position of essentially defending a regulatory change that the agency was previously sued for not making.  Though one would hope the Federal government will vigorously defend the Final Rule that The HSUS worked so hard to see published, it is certainly conceivable that Defendants might agree to settle rather than litigate, and remand the rule for additional review.   Moreover, Defendants are obligated to consider the desires of the entirety of the American public while The HSUS represents its members and the animals its members care about.  *See Norton*, 322 F.3d at 736 ("[agency's] obligation is to represent the interests of the American people…while the [purported intervenor's] concern is for Mongolia's people and natural resources…").   As such, The HSUS's interests and those of Defendants "might diverge during the course of litigation."  *WildEarth Guardians*, 272 F.R.D. at 15 (citation omitted).

Therefore, since The HSUS satisfies the requirements of Fed. R. Civ. P 24(a), this motion to intervene as of right should be granted.

**B.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT HSUS PERMISSIVE INTERVENTION.**

In the alternative, The HSUS asks that this Court grant permissive intervention pursuant to Fed. R. Civ. P 24(b).  Permissive intervention is allowed when the movant makes a "timely motion" and "has a claim or defense that shares with the main action a common question of law or fact."  *Id.*  The Court must also "consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' right."  *Id.*  Here, The HSUS undoubtedly shares a common defense with Defendants in that the agency did not violate the Administrative Procedure Act when it promulgated the Final Rule.  Further, as demonstrated above, this motion is timely and would neither unduly delay this mater nor prejudice Plaintiffs nor Defendants.

Therefore, The HSUS respectfully requests that it be allowed to intervene pursuant to Fed. R. Civ. P 24(b) if this Court denies The HSUS's request for intervention as of right.

## CONCLUSION

WHEREFORE, The Humane Society of the United States respectfully prays that this Honorable Court grant its Motion to Intervene.

Respectfully Submitted,

Date: Dec. 30, 2013

  /s/  *Aaron D. Green*
Aaron D. Green  (D.C. Bar No. 1015611)*
agreen@humanesociety.org
Jonathan Lovvorn (D.C. Bar No. 461163)
The Humane Society of the United States
2100 L Street, NW
Washington, DC  20037
Ph. (202) 676-2334
Fax. (202) 676-2357

*Attorneys for Proposed-Intervenor-Defendant*
*The Humane Society of the United States*

*Swearing-in to this Court pending.*