# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |  |
|---|---|
| **ASSOCIATED DOG CLUBS OF NEW YORK STATE, <u>et al.</u>,**<br><br>Plaintiffs,<br><br>v.<br><br>**TOM VILSACK, Secretary, United States Department of Agriculture, and UNITED STATES DEPARTMENT OF AGRICULTURE,**<br><br>Defendants,<br><br>**THE HUMANE SOCIETY OF THE UNITED STATES**<br><br>Proposed-Intervenor/Defendant. | Civil Action No. 1:13-cv-1982 (CRC) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiffs brought suit to challenge a Department of Agriculture rule extending the licensing requirements of the Animal Welfare Act to certain on-line pet dealers. The Humane Society of the United States seeks to intervene in the action to defend the rule. Because the Humane Society has demonstrated that the challenge may impede its well established animal cruelty programs and that the USDA may not adequately represent its interests in defending the suit, the Court will grant the Humane Society's motion to intervene.

**I.      Background**

The Animal Welfare Act, ("AWA"), 7 U.S.C. § 2131, <u>et seq.</u>, establishes licensing and operational requirements for pet dealers. <u>Id.</u> § 2133. The AWA defines "dealer" as any person who for profit buys or sells dogs or other specified animals for use as pets, but it specifically excludes "retail pet store[s]" from that definition. <u>Id.</u> § 2132(f). The Act itself does not define the term

"retail pet store." Congress left that to the Secretary of Agriculture, who administers the Act. Id. § 2151.

For over forty years, the USDA maintained a regulation that, with certain exceptions, broadly defined "retail pet store" as "any outlet" where dogs, cats and twelve other categories or species of animals are sold to the public for use as pets. 9 C.F.R. § 1.1 (2004). The agency defended that definition against a challenge from animal protection groups as recently as 2003. See Doris Day Animal League v. Venemon, 315 F.3d 297 (D.C. Cir. 2003). In 2012, however, the USDA changed course. Responding to concerns raised by the animal protection community, including the Humane Society, over the alleged proliferation of on-line "puppy mills," the agency issued a proposed rule to revise the "definition of retail pet store and related regulations to bring more animals sold at retail under the protection" of the AWA. 77 Fed. Reg. 28799-01 (May 16, 2012). The new rule, which became final on September 18, 2013, redefined "retail pet store" to mean "a place of business or residence at which the seller, buyer and the animal available for sale are physically present so that every buyer may personally observe the animal prior to purchasing and/or taking custody of that animal after purchase[.]" 9 C.F.R. § 1.1.[1]

Plaintiffs are a collection of dog and cat breeding clubs that object to the regulatory requirements they claim will result from the new retail pet store definition. Bringing suit under the Administrative Procedures Act ("APA"), they contend that the USDA failed to justify the new rule, did not consider objections filed by the plaintiffs during the notice and comment period, and exceeded its authority under the AWA.

---

[1] Presumably to lessen the impact of the new definition on small breeders, the rule also widened an existing exemption based on the number of animals a breeder keeps on his or her premises. Under the expanded exemption, breeders are not subject to licensing if they maintain four or fewer breeding females on their premises and sell only the offspring of those animals for use as pets or for exhibition. Id. § 2.1.

Apparently concerned that that the USDA "might agree to settle rather than litigate" the plaintiffs' challenge to the rule that it helped bring about, the Humane Society moved to intervene as a defendant in the case. Mot. to Intervene at 17. It argues that it will be forced to expend additional resources to respond to "animal cruelty emergencies at non-USDA licensed puppy mills" if the rule is set aside and questions whether USDA adequately represents its interests in defending the rule. The breeding clubs oppose the motion to intervene because, in their view, the Humane Society's voluntary expenditure of resources "to hound breeders acting within the bounds of the law" is not a "legally protected" interest justifying intervention and because the USDA adequately represents the Humane Society's interests, whatever they may be. Opp. to Mot. to Intervene at 4–6. The government takes no position on the motion.

**II.     Analysis**

The Humane Society seeks to intervene both as of right and permissively under Federal Rules of Civil Procedure 24(a) and (b). Because the Court concludes that the Humane Society has met the requirements for intervention as of right, it need not reach the Humane Society's permissive intervention argument. Rule 24(a)(2) permits parties to intervene in a pending action if (1) the motion to intervene is timely; (2) the movant "claims an interest relating to the property or transaction that is the subject of the action"; (3) the movant "is so situated that disposition of the action may as a practical matter impair or impede the movant's ability to protect its interest"; and (4) the movant's interest is not adequately represented by existing parties. Fed. R. Civ. P. 24(a); accord Fund for Animals, Inc. v. Norton, 322 F.3d 728, 731 (D.C. Cir. 2003) (quoting Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1074 (D.C. Cir. 1998)). Additionally, a party seeking to intervene as of right in this Circuit "must demonstrate that it has standing under Article III of the Constitution." Fund for Animals, 322 F.3d at 731–32 (citing Military Toxics Project v. EPA), 146 F.3d 948, 953 (D.C. Cir. 1998)). The Court will first address whether the Humane Society has

3

standing.

### A. Standing

To satisfy the Article III standing requirements,

> the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (footnote, citations, and quotations omitted). An organization "'may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'" Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 132 (D.C. Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 511 (1975)). To establish standing in its own right, an organization must demonstrate that that it has suffered a "concrete and demonstrable injury to [its] activities—with [a] consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests." Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)).

The Humane Society has made this showing. The organization's animal cruelty programs are well established. See Humane Society of U.S. v. Postal Serv., 609 F. Supp. 2d 85, 89 (D.D.C. 2009) (describing Humane Society programs). And it has demonstrated how invalidating the rule would require it to divert additional resources to police suspected animal cruelty by non-licensed breeders. See Mot. to Intervene at 13. Citing as examples the costs incurred treating animals captured in two federal raids, the Humane Society explains that "if the Final Rule remains in place,

it is highly likely that [it] would no longer have to engage in so many raids of unlicensed breeding facilities." Id. at 13–14. The Humane Society also asserts that a successful challenge to the rule would hamper its investigatory and educational programs by depriving it of information collected on licensed breeders. Id. at 14–16. Indeed, the breeding clubs themselves acknowledge that "the newly promulgated Rule saves HSUS money, enables HSUS to be more efficient in gathering information, and gives HSUS additional traction in its lobbying efforts." Opp. to Mot. to Intervene at 4. Case law in this Circuit firmly establishes that these types of impediments to an advocacy organization's activities constitute "concrete and demonstrable" injuries sufficient to confer standing. See, e.g., Action Alliance of Senior Citizens of Greater Phila. v. Heckler, 789 F.2d 931, 937–38 (D.C. Cir. 1986) (elimination of compliance and information collecting services by government agency harmed private entity by increasing the burden on its "information-dispensing, counseling, and referral activities"); People for the Ethical Treatment of Animals ("PETA") v. Dep't of Agric., 13-976, 2013 WL 6571845, at *4 (D.D.C. Dec. 16, 2013) (USDA's alleged "failure to enforce the AWA with respect to birds" deprived the PETA "of key information that it relies on to educate the public" forcing it to "expend additional resources . . . by pursuing complaints about bird mistreatment . . . and by conducting its own investigations."); Humane Society of U.S., 609 F. Supp. 2d at 89 (Humane Society had standing to challenge postal service rule that increased costs of responding to animal cruelty raids).

The Humane Society's standing to intervene is not diminished, as the breeding clubs argue, because it seeks to defend, rather than challenge, the USDA rule. Opp. to Mot. to Intervene at 6.[2]

---

[2] While the breeding clubs direct this argument to the "legally protected interest" prong for intervention as of right, Opp. to Mot. to Intervene at 4–6, the Court will address it in discussing whether the Humane Society has standing because the inquiries are functionally identical under this Circuit's precedent. See, e.g., Cal. Valley Miwok Tribe v. Salazar, 281 F.R.D. 43, 47 (D.D.C. 2012) (citing Jones v. Prince George's Cnty., 348 F.3d 1014, 1019 (D.C. Cir. 2003)); Am. Horse Prot. Ass'n v. Veneman, 200 F.R.D. 153, 157 (D.D.C. 2001).

Harm caused to an organization's programs by the invalidation of a rule is no less concrete or demonstrable than the same harm caused by an agency's failure to enforce a rule. Consistent with this principle, a number of decisions in this Circuit have permitted intervention by parties seeking to defend government action. See Fund for Animals, 322 F.3d at 733–34 (agency of the Mongolian government and private groups could intervene to defend Department of the Interior regulation enabling hunters of Mongolian sheep to bring trophies to the United States); Military Toxics Project, 146 F.3d at 954 (trade association had standing to intervene to defend EPA rule because its members would be harmed if rule was set aside); Wildearth Guardians v. Salazar, 272 F.R.D. 4, 13–18 (D.D.C. 2010) (coal mines intervened to defend Department of the Interior decision selling them land against a challenge by environmental groups). In American Horse Protection Association v. Veneman, 200 F.R.D. 153 (D.D.C. 2001), for example, an animal protection organization brought suit to challenge USDA's allegedly lax enforcement of rules designed to protect show horses from training injuries. Id. at 155–56. A group of show horse trainers who were directly affected by the rules moved to intervene to defend the agency's enforcement regime. Id. at 156–57. The court ruled that the trainers had standing to intervene as of right because they demonstrated that they "will be injured in fact by the setting aside of the government's action it seeks to defend, that this injury will have been caused by that invalidation, and the injury would be prevented if the government action is upheld." Id. at 156. The same is true here.

Nor does it matter that the Humane Society voluntarily chooses to engage in its programs. See Opp. to Mot. to Intervene at 4. While "[a]n organization is not injured by expending resources to challenge [a] regulation," Abigail Alliance, 469 F.3d at 133, injuries to programs undertaken by choice may be sufficient to establish standing. See Havens Realty, 455 U.S. at 368 (describing organization and program); see also Humane Society of U.S., 609 F. Supp. 2d at 89 (Humane Society had standing to challenge government actions that harmed voluntary program to address

6

animal cruelty).

  B. Timeliness

Moving to Rule 24(a)'s timeliness requirement, the Humane Society filed its motion to intervene 14 days after the breeding clubs filed their initial complaint. The motion is clearly timely, which the breeding clubs do not dispute. See, e.g., Fund for Animals, 322 F.3d at 735 (filing motion "less than two months after the plaintiffs filed their complaint and before the defendants filed an answer" is timely).

  C. Interest Related to the Action

A party seeking to intervene must next "claim[] an interest relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a). The Humane Society has met this requirement because "in this Circuit, 'satisfying constitutional standing requirements demonstrates the existence of a legally protected interest.'" Cal. Valley Miwok Tribe v. Salazar, 281 F.R.D. 43, 47 (D.D.C. 2012) (quoting Jones v. Prince George's Cnty., 348 F.3d 1014, 1019 (D.C. Cir. 2003)); accord Am. Horse Prot. Ass'n, 200 F.R.D. at 157.

  D. Action Will Impede the Movant's Interest

The Humane Society also satisfies Rule 24(a)'s requirement that disposition of the action will impair the movant's ability to protect its interest. Whether the action will impede the movant's interest depends on the "'practical consequences of denying intervention, even where the possibility of future challenge to the regulation remain[s] available.'" Fund for Animals, 322 F.3d at 735 (quoting Natural Res. Def. Council v. Costle, 561 F.2d 904, 909 (D.C. Cir. 1977)). As noted above, Plaintiffs acknowledge that the new rule benefits the Humane Society's programs and that vacating that rule would remove that benefit. Opp. to Mot. to Intervene at 4. This potential harm is not obviated by the Humane Society's ability to "reverse an unfavorable ruling by bringing a separate lawsuit," given the cost and delay of doing so. See Fund for Animals, 322 F.3d at 735 (citing

7

Natural Res. Def. Council, 561 F.2d at 910); accord Am. Horse Prot. Ass'n, 200 F.R.D. at 158–59.

      E.  Adequate Representation

Finally, a party seeking to intervene under Rule 24(a)(2) must show that that its interests are not "adequately represented" by existing parties. This requirement is "'not onerous.'" Fund for Animals, 322 F.3d at 735 (quoting Dimond v. Dist. of Columbia, 792 F.2d 179, 192 (D.C. Cir. 1986)). The movant need only show that the current representation "'may be inadequate[.]'" Id. (quoting Trbovich v. United Mine Workers, 404 U.S. 528, 538 n.10 (1972)). As a result, this Circuit "often conclude[s] that governmental entities do not adequately represent the interests of aspiring intervenors." Id. at 736–37 (citing Dimond, 792 F.3d at 192–93) & n.9 (collecting cases).

The Humane Society argues that, in light of the USDA's prior defense of the broader retail pet store definition, it might not defend the new rule as vigorously as the Humane Society would like, particularly because the government is "obligated to consider the desires of the entirety of the American public" over the Humane Society's narrower interests. Mot. to Intervene at 17. The breeding clubs assert that the USDA adequately represents the Humane Society's interests because "USDA [will] defend the Rule as being in [the] best interests of 'the entirety of the American public,' especially [the Humane Society]." Opp. to Mot. to Intervene at 7.

The Humane Society has overcome the low hurdle required to show inadequacy of present representation. "[M]erely because parties share a general interest in the legality of a program or regulation does not mean their particular interests coincide so that representation by the agency alone is justified." Am. Horse Prot. Ass'n, 200 F.R.D. at 159. The Humane Society has "a distinct and weighty interest" in furthering its investigatory and information-dissemination programs that is not equivalent to the government's broader concerns. See, e.g., Cal. Valley Miwok Tribe, 281 F.R.D. at 47–48; see also, Fund for Animals, 322 F.3d at 736 ("taking the [proposed intervenor's] efforts 'into account' does not mean giving them the kind of primacy that the [proposed intervenor]

would give them").

   II.   **Conclusion**

For the foregoing reasons, the Humane Society has met the requirements for intervention as of right under Rule 24(a). It is hereby **ORDERED** that the Motion to Intervene by the Humane Society of the United States is GRANTED

**SO ORDERED.**

CHRISTOPHER R. COOPER
United States District Judge

Date:     May 16, 2014

9