# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ASSOCIATED DOG CLUBS OF NEW YORK STATE, INC., et al.,** <br><br> Plaintiffs, <br><br> v. <br><br> **THOMAS J. VILSACK, Secretary, United States Department of Agriculture, et al.,** <br><br> Defendants, <br><br> and <br><br> **THE HUMANE SOCIETY OF THE UNITED STATES,** <br><br> Intervenor-Defendant. | Case No. 1:13-cv-01982 (CRC) |

## MEMORANDUM OPINION

With few exceptions, there is nothing one can buy in a traditional store that cannot be bought online as well. It should come as no surprise, then, that the Internet unleashed a growing online market for pet sales. Prompted by this expansion of sight-unseen sales over the Internet, the Department of Agriculture, through the Animal and Plant Health Inspection Service ("APHIS"), issued a new rule that redefined "retail pet store"—a statutory category of pet sellers exempt from regulation by the agency. Whereas APHIS previously exempted from regulation all outlets that sold certain animals directly to the public, its revised retail pet store definition exempted only face-to-face sellers. Many online sellers thus became subject to regulation for the first time. The new rule brought howls from small breeders anxious over the potential costs of regulatory oversight. A collection of those breeders—through some 42 separate dog and cat clubs—seek to bring APHIS to heel, arguing that the agency exceeded its statutory authority in issuing the new rule. But the clubs are barking up the wrong tree: Their complaints are more policy disagreements with APHIS's

regulatory approach than they are valid legal objections to APHIS's authority and the process it followed in adopting the rule. Because APHIS acted within its authority in promulgating the rule and otherwise complied with the requirements of the Administrative Procedures Act, the Court will grant summary judgment for the agency.

**I.      Background**

Congress passed the Animal Welfare Act ("AWA"), 7 U.S.C. § 2131 et seq., in 1966 "to insure that animals intended . . . for use as pets are provided humane care and treatment," id. § 2131(1). The Act gives the Secretary of Agriculture authority, which has been delegated to APHIS, to promulgate regulations that require "animal dealers" to be licensed, keep records, and maintain humane facilities. Id. §§ 2133, 2143. The AWA exempts "retail pet stores" from the definition of "animal dealers"—making them free from all regulation by APHIS—but the statute does not define that term. Id. § 2132(f). Congress left that task to the Secretary. Accordingly, APHIS issued a regulation in 1971 defining "retail pet store" to mean "any retail outlet where animals are sold only as pets at retail." 36 Fed. Reg. 24,917, 24,919 § 1.1(t) (Dec. 24, 1971). It later created a *de minimis* exception from regulation for any person who maintains three or fewer breeding females and who sells only the offspring of those females for pets or exhibition. 54 Fed. Reg. 36,123, 36,148 § 2.1(a)(3)(iii) (Aug. 31, 1989). Although both APHIS and Congress considered several alternative definitions over the years, these regulations remained relatively unchanged over the next several decades.

In 2010, however, the Department of Agriculture Office of the Inspector General ("OIG") published an audit report critical of APHIS's inspection program. OIG, APHIS Animal Care Program Inspections of Problematic Dealers, Audit Report 33002-4-SF ("OIG Report") (May, 2010), Administrative Record ("AR") 146–214. Among other issues, the report documented a pack of complaints by owners of sick or injured animals purchased from unregulated online sellers. Id.

2

at 186. The report observed, however, that '[l]arge breeders that sell AWA-covered animals over the Internet . . . [we]re exempt from [APHIS's] inspection and licensing requirements" because online sellers fell within the definition of retail pet stores. Id. at 185. It therefore urged APHIS to seek legislation to cover these unregulated entities. Id. at 186. APHIS responded favorably to the recommendation, assuring the OIG that it was promoting a bill that "would place dogs sold directly to the public via the Internet . . . within the jurisdiction of the AWA." Id. at 187.

Instead of continuing to pursue legislative change, however, APHIS determined that "the AWA's definition of a regulated 'dealer' is sufficiently broad to allow us to clarify—without legislation—the regulatory definition of a 'retail pet store' so that Internet retail sales of regulated animals are covered[.]" Letter from Cindy J. Smith, APHIS Administrator, to Congressman Bob Goodlatte (Sep. 9, 2010), AR at 241. APHIS thus published a notice of proposed rulemaking to limit the retail pet store exemption to only those outlets where "each buyer physically enters [the store] in order to personally observe the animals[.]" Proposed Rule, 77 Fed. Reg. 28,799 (May 16, 2012), AR 322–28.

APHIS also published a Regulatory Impact Analysis that sought to estimate the number of breeders that would be covered by the new rule and its resulting economic impact on those breeders. APHIS, Regulatory Impact Analysis & Initial Regulatory Flexibility Analysis (April 2012) ("Impact Analysis"), AR 400–62. The analysis acknowledged that "[t]here is a great deal of uncertainty surrounding the number of facilities that will be affected by this rule[.]" Id. at 402. APHIS nevertheless developed an estimate by first identifying breeders listed in two online breeder registries and assuming an additional unlisted breeder for every four listed breeders, which yielded approximately 8,400 to 15,000 dog breeders nationally. Id. at 402–403. It then assumed that 75 percent of those breeders sell dogs as pets, 55 percent have more than four breeding females, and 75 percent make sight-unseen sales, thereby arriving at an estimated 2,599 to 4,641 online dog sellers

3

that would be covered by the regulations for the first time. Id. Using a similar methodology, APHIS estimated 325 cat breeders and 75 rabbit breeders also would be affected by the new rule. Id. at 414–16.

APHIS predicted that compliance costs for newly-regulated breeders would vary widely depending on the size of their facilities and their existing level of compliance with the regulations. Because comments to the proposed rule indicated that breeders generally maintain facilities above the minimum humane treatment standards the AWA requires, APHIS assumed the new rule would result in only modest additional costs to build new structures. Id. at 423. The impact analysis indicated that dog breeders with noncompliant facilities would be required to either purchase dog houses that provide adequate shelter from the elements, which fetch between $80 and $120 for "an igloo-style dog house," or would need to construct additional commercial kennels, which were estimated to cost between $220 and $260 per animal. Id. at 428–29. APHIS estimated that breeders who did not meet the regulation's veterinary care standards would incur costs of between $1,375 and $3,570 for site visits, care issues, and vaccinations. Id. at 425–26. The impact analysis estimated that meeting cleaning and sanitation requirements would require between one and two hours of work per day, which would cost between $3,420 and $6,850 a year if a breeder chose to hire outside labor. Id. at 427. The analysis estimated that *all* newly regulated dog breeders would be subject to licensing, tagging, and recordkeeping costs of between approximately $250 and $1,055 depending on their size. See id. at 419–21. By applying these figures to the estimated numbers of newly regulated compliant and noncompliant breeders, APHIS estimated the total cost of compliance would range between $853,000 and $2.8 million annually for all breeders. Id. at 430.

After receiving over 75,000 comments, which both supported and opposed the new rule, APHIS promulgated the new definition of "retail pet store" in September 2013. Final Rule, 78 Fed. Reg. 57,227 (Sep. 18, 2013), AR 375–98. Along with the new definition, the rule change also

4

expanded the *de minimis* exception from three to four breeding females. Id. The pertinent sections of the final rule provide:

> Retail pet store means a place of business or residence at which the seller, buyer, and the animal available for sale are physically present so that every buyer may personally observe the animal prior to purchasing and/or taking custody of that animal after purchase[.]

9 C.F.R. § 1.1.

> The following persons are exempt from the licensing requirements . . . . Any person who maintains a total of four or fewer breeding female dogs, cats, and/or small exotic or wild mammals . . . and who sells, at wholesale, only the offspring of these [breeding females], which were born and raised on his or her premises, for pets or exhibition, and is not otherwise required to obtain a license.

Id. § 2.1(a)(3)(iii).

Plaintiffs, a collection of 42 dog and cat clubs and registries,[1] then brought this suit, alleging that the agency's rulemaking violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Approximately three months later, Congress passed the Agricultural Act of 2014, Pub. L. No. 113-79, which amended the AWA to, among other things, exempt from licensing "a dealer or exhibitor under this Act if the size of the business is determined by the secretary to be *de minimis*." Id. § 12308 (italics added). The Conference Report for the bill explains that the amendment was meant to codify APHIS's prior *de minimis* exception, so that APHIS could focus "its limited budget and inspection and enforcement staff on entities that pose the greatest risks to animal welfare and public safety." 160 Cong. Rec. H1269-01. The Conference Report also recommended that APHIS engage in rulemaking to further define the *di minimis* exception given "confusion among the regulated industry" over the term "breeding female." Id. The Agricultural Act did not affect APHIS's new definition of retail pet store. After the clubs brought suit, the Humane Society of the United States filed a motion to intervene to defend the rule, which the Court granted. Mem. Op. and Order (May

---

[1] With no offense to our feline friends, the Court will refer to the Plaintiffs as "dog clubs" or simply "clubs."

16, 2014). The dog clubs, the Secretary, and the Humane Society have now cross-moved for summary judgment.

**II.     Standard of Review**

Summary judgment in an APA case supported by an administrative record generally does not apply the standard set forth in Federal Rule of Civil Procedure 56(a). See, e.g., AFL–CIO v. Chao, 496 F. Supp. 2d 76, 81 (D.D.C. 2007); Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006). Instead, the district court's role "'is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769–70 (9th Cir. 1985)). "Summary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." Id. (citing Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

**III.    Analysis**

The dog clubs have two main bones of contention with the new rule. First, they argue that APHIS exceeded its regulatory authority under the AWA by changing the agency's long-established definition of "retail pet store," which they view as inconsistent with the new definition. Second, the clubs contend that the agency's rulemaking process was arbitrary and capricious because APHIS underestimated the number of breeders that would be affected by the new rule, minimized the fiscal impact of the rule on those breeders, and arbitrarily covered smaller breeders despite the fact that the OIG only identified problems with *large* Internet sellers.

A.  Authority Under the AWA

Chevron, U.S.A. v. Natural Resources Defense Council, 467 U.S. 837 (1984), establishes a two-part inquiry to determine whether an agency charged with implementing a statute has arrived at

6

a permissible interpretation of the law. First, if a law directly addresses the precise question at issue, Congress's directive is, of course, controlling. Id. at 842–43. Second, if the statute is silent or ambiguous regarding the matter at hand, "'the question for the court is whether the agency's interpretation is based on a permissible construction of the statute in light of its language, structure, and purpose.'" Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth., 754 F.3d 1031, 1042 (D.C. Cir. 2014) (quoting Chao, 409 F.3d at 384). The court must defer to *any* reasonable agency interpretation, Loving v. IRS, 742 F.3d 1013, 1016 (D.C. Cir. 2014); the interpretation need not be the one "deemed *most* reasonable by the courts[,]" Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 218 (2009) (emphasis in original).

As the Secretary and the clubs both agree, the D.C. Circuit in Doris Day Animal League v. Veneman, 315 F.3d 297 (D.C. Cir. 2003), found the meaning of "retail pet store" in the AWA to be ambiguous. Id. at 300 ("there is enough play in the language of the Act to preclude us from saying that Congress has spoken to the issue with clarity"). Thus, the only question before the Court is whether, under Chevron step-two, the agency's new rule is a reasonable construction of the term. The Court concludes that it is.

The new rule limits the retail pet store exemption to outlets where the seller, buyer, and animal are physically present at each sale, while the old rule considered *any* retail outlet, including mail-order or online sellers, to be exempt from AWA regulation. APHIS justified the limitation by explaining that face-to-face buyers are able to inspect the seller's premises and the animals. Final Rule, 78 Fed. Reg. at 57,227, AR 375. Online buyers, by contrast, generally cannot determine the animal's condition before receiving the pet and may never see the seller's facilities. Particularly in light of the recent growth in online sales, the Secretary posited that this lack of oversight by online buyers justified bringing sight-unseen sales within the scope of APHIS regulation.

The Secretary's justification for the rule is reasonable on its face. The dog clubs nevertheless maintain that APHIS exceeded its authority because the new definition of retail pet store is inconsistent with the agency's prior definition, which had allowed unregulated sight-unseen sales for 47 years and which APHIS defended against an APA challenge as recently as 2003. See Doris Day, 315 F.3d at 297. But that dog won't hunt. An agency may change, or even reverse, longstanding positions while enjoying Chevron deference so long as it provides a reasoned explanation for doing so. E.g., Verizon v. FCC, 740 F.3d 623, 636 (D.C. Cir. 2014). APHIS has provided such an explanation here. The clubs overstate the regulatory change in any event: The prior rule did not *expressly* exempt sight-unseen sales; it merely failed to address them. Thus, APHIS's new approach is more accurately described as closing a loophole than reversing a settled position. As APHIS explained, it updated the definition to address the "dramatic rise in sight unseen sales" brought on by the Internet. Final Rule, 78 Fed. Reg. 57,227, AR 375. Closing a loophole because it has grown into a significant regulatory gap is a sufficiently reasoned explanation for adopting a new agency position. See Ctr. for Sci. in the Pub. Interest v. U.S. Dep't of Treasury, 797 F.2d 995, 998–99 (D.C. Cir. 1986)

Despite the clubs' assertions to the contrary, the Secretary's current position is not inconsistent with the government's litigation position in Doris Day, where a previous Secretary defended the prior retail pet store definition. 315 F.3d at 297. The government's position in Doris Day was that the definition of retail pet store was not clearly established, and APHIS's interpretation of the term was reasonable in light of that ambiguity. See id. at 300. The government still maintains that the term is open for interpretation; it simply argues that both the prior and current definitions are reasonable. Moreover, the primary defense of the regulation advanced by the Secretary in Doris Day was that "'retail dealers . . . are already subject to a degree of self-regulation and oversight by persons who purchase animals from the retailers' homes.'" Id. at 301 (quoting 64

8

Fed. Reg. 38,546 (July 19, 1999)). As discussed above, that justification does not apply to online sales. See OIG Report, AR 185 ("for Internet breeders, there is no degree of self-regulation and oversight because consumers do not have access to their facilities"). Accordingly, the prior Secretary's position in Doris Day does not undercut APHIS's authority to promulgate the rule at issue here.

The dog clubs also contend that APHIS's revision of the retail pet store definition through rulemaking is inconsistent with its prior commitment to address its concerns about online sellers via legislation. Pls.' Mem. in Supp. of Mot. Summ. J. ("Pls.' Mem.") at 20. They rely on American Mining Congress v. United States Army Corps of Engineers, 951 F. Supp. 267 (D.D.C. 1997), where the district court rejected the agency's revised definition of "discharge" under the Clean Water Act. Id. at 272–77. In a footnote, the court observed in passing that the agency had intended to clarify the term through legislation before issuing the challenged regulation. Id. at 276 n.20. But the court did not rely on this fact in holding that the text and legislative history of the Clean Water Act did not support the agency's interpretation. Id. at 272–77. American Mining Congress therefore does not help the clubs, and they have not offered any other authority for the proposition that an agency's stated intention to pursue legislative change forever bars it from seeking the same result through regulation. Cf. Devon Energy Corp. v. Kempthorne, 551 F.3d 1030, 1039 (D.C. Cir. 2008) (interim or non-final agency interpretations are not binding on an agency) (citing Bennett v. Spear, 520 U.S. 154, 177–78 (1997)).

The clubs also argue that APHIS exceeded its authority because Congress acquiesced in the prior definition of "retail pet store" by reenacting the AWA several times without modifying the definition. When Congress reenacts a statute but does not modify an Agency's interpretation of a regulatory provision, it can be evidence that Congress has endorsed the interpretation. E.g., Doris Day, 315 F.3d 297 at 300 (citing among others Commodity Futures Trading Comm'n v. Schor, 478

9

U.S. 833, 846 (1986)); Am. Mining Cong., 951 F. Supp. at 270. APHIS emphasizes, however, that Congress reenacted the AWA *after* the rule change as well. Agricultural Act of 2014, Pub. L. No. 113-79 § 12308. Indeed, although the Court is somewhat leery of congressional acquiescence arguments generally, the subsequent passage of the Agricultural Act of 2014 creates a particularly sturdy footing for the argument that Congress acquiesced to the *new* definition. That is so because the Agricultural Act codified one aspect of the AWA exemption—the historic *de minimis* exception—but did not affect the brand-new "retail pet store" definition. See id. Similarly, the Conference Report on the bill urges APHIS to clarify the meaning of "breeding female" but does not mention the new definition of "retail pet store." See 160 Cong. Rec. H1269-01. Both the Act and its legislative history thus suggest that members of Congress specifically considered the retail pet store exemption immediately after APHIS changed the definition but left the change untouched. Short of explicit endorsement, it is difficult to imagine a better example of congressional acquiescence to a regulatory change.

### B. Arbitrary and Capricious Review

The APA forbids final agency action that is arbitrary or capricious. 5 U.S.C. § 706(2)(A). This means, among other things, that the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). An agency's findings of fact must also be supported by substantial evidence. 16 U.S.C. § 825l(b). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and requires more than a scintilla but less than a preponderance of evidence." S.C. Pub. Serv. Auth. v. FERC, 762 F.3d 41, 54 (D.C. Cir. 2014) (quotations omitted). "When applied to rulemaking proceedings, the substantial evidence test 'is identical to the familiar arbitrary

10

and capricious standard,' which 'requires the [agency] to specify the evidence on which it relied and to explain how that evidence supports the conclusion it reached.'" Id. (quoting Wis. Gas Co. v. FERC, 770 F.2d 1144, 1156 (D.C. Cir. 1985)).

An agency can change its prior position to address a loophole, even a longstanding one, and can decide that a growing problem warrants more oversight than was previously necessary. See, e.g., Ctr. for Sci. in the Pub. Interest v. U.S. Dep't of Treasury, 797 F.2d 995, 998–99 (D.C. Cir. 1986) ("it is not improper for an agency to engage in new rulemaking to supersede defective rulemaking" so long as it provides a reasoned analysis of its decision (quotation omitted)). As explained previously, APHIS determined that the new rule was necessary because the burgeoning online pet market sparked a large increase in unregulated, sight-unseen sales. Final Rule, 79 Fed. Reg. 57,228, AR 376. While sight-unseen sales have existed since AWA's inception, the clubs do not dispute the growth of the online pet market. They nonetheless argue that the agency's response was disproportionate to the problems it identified.

i) <u>Inclusion of small breeders</u>

The clubs first argue that APHIS did not adequately explain why it was extending the new rule beyond very large breeders in light of the fact that the OIG Report criticizing the online sales loophole focused on "large" Internet breeders. OIG Report, AR 185–87. Yet, APHIS also received reports of animal abuse by online retailers independent of the OIG report. Proposed Rule, 77 Fed. Reg. 28,801, AR 322. Moreover, even assuming the OIG Report was the genesis of the new rulemaking, the clubs' argument cuts the issue too finely. Although the report at times refers to "large" breeders, it also raises concerns about unregulated Internet breeders generally. Id. In fact, after conducting an informal search to estimate what percentage of online breeders *who did not meet the de minimis exception* were unregulated, id. at 186, the OIG recommended simply to "exclude Internet breeders from the definition of 'retail pet store[.]'" Id. at 187.

11

The APA does not, in any event, require agencies to tailor their regulations as narrowly as possible to the specific concerns that generated them. APHIS's reasoning for the rule change—that the public cannot inspect or monitor online retailers' physical facilities—applies to smaller online sellers as well as large ones, regardless of whether the agency had only received reports of mistreatment by large online sellers. See id. Surviving arbitrary and capricious review requires only a reasoned explanation based on the facts found by the agency, e.g., Verizon v. FCC, 740 F.3d 623, 636 (D.C. Cir. 2014), which is precisely what APHIS provided. Furthermore, the gap between what the OIG Report termed "large" sellers and what the clubs term "small" sellers appears to be fairly narrow. At the hearing on these motions, the parties acknowledged that five breeding females—the fewest number that would exceed the *de minimis* exception—would ordinarily be capable of producing 50 or more animals a year, see Comments, AR 131,552, which is not too far off from the 83 dogs owned by some of the "large" animal breeders mentioned in the OIG Report. See Pls.' Opp'n at 7.

ii)  Cost estimates

The clubs also assert that APHIS underestimated the number of breeders that would be affected by the rule and the costs associated with compliance. As explained above, APHIS identified breeders in two online registries, made certain assumptions, and estimated that roughly 3,000 to 5,000 additional breeders would be covered by the rule. Other knowledgeable sources, such as the American Kennel Club, provided comments estimating a much higher number. The clubs rely on these later estimates to suggest that the Secretary's estimate was unreasonable.[2] As

---

[2] The clubs also emphasize the D.C. Circuit's offhand comment in Doris Day that "[h]undreds of thousands of dog breeders throughout the United States raise and sell puppies from their homes." 315 F.3d at 297. The court did not support this statement with a citation or analysis, it was immaterial to the opinion's reasoning and outcome, and the court did not suggest how many of those household breeders would fall below the *de minimis* threshold. Accordingly, the comment is neither binding on nor persuasive to this Court.

the Secretary points out, however, the clubs offer no better methodology for determining how many online dog and cat breeders exist. They simply draw from other online breeding registries and, by adding together multiple available lists, arrive at a much larger number. Not only does this approach fail to undercut the reasonableness of APHIS's estimates, the clubs' methodology does not appear to correct for breeders who are listed in multiple registries, likely resulting in counting the same breeders multiple times.

Beyond the number of affected breeders, the clubs dispute APHIS's assumptions of the costs that breeders will incur to construct new facilities. But the breeders' bark seems bigger than the regulator's bite. The impact of facilities costs on the overall industry of hobby breeders appears to be modest. APHIS estimated that only one percent of newly-regulated breeders would be required to construct new primary enclosures, Impact Analysis, AR 432, and that the cost of building new kennels would range from $220 to $2,600 for each affected breeder, id. at 429. The clubs do not posit any greater percentage. They point instead to comments by four individuals who asserted that building new facilities to comply with regulations would cost between $20,000 and $40,000. Pls.' Mem. at 14 (citing AR at 1840, 2760, 7242, and 731). But neither the clubs nor the underlying comments explain why complying with the regulations would cost tens of thousands of dollars. These unsubstantiated comments do not discredit the agency's estimates. See Helicopter Ass'n Int'l v. FAA, 722 F.3d 430, 439 (D.C. Cir. 2013) ("An unsubstantiated estimate is insufficient to call the agency's figure into question.").

Even if a handful of breeders not considered in APHIS's Impact Analysis would have to construct new buildings to continue breeding as many dogs as they currently do, that would not make the rule arbitrary and capricious. APHIS's substantive regulations require housing facilities that secure and protect animals from injury; provide adequate heating, cooling, ventilation, and lighting; and allow access to potable water, washrooms, and drainage of excrement. 9 C.F.R § 3.1.

13

The clubs assert that some members will now be required to buy or construct new buildings with plumbing, electrical, and heating systems. Pls.' Mem. at 26–27. But the regulations permit outdoor housing facilities with none of those features unless the breed cannot tolerate the prevalent temperatures in the area. 9 C.F.R. § 3.4(a)(1)(i)-(iii). Thus, if the clubs are correct that some of their members would have to build new housing to avoid keeping dogs in inappropriate conditions, it would only substantiate APHIS's underlying justification for the rule: some unregulated online retailers may be treating their animals inhumanely.

The clubs also complain that their members will have to pay to comply with licensing and reporting requirements. Pls.' Opp'n at 10. But the clubs do not point to any errors in APHIS's cost assumptions for complying with the AWA licensing and reporting requirements. APHIS estimated licensing and reporting costs to be between $250 and $1,055, depending on the size of the breeder. Impact Analysis, AR 419–21. These estimates, based on APHIS's knowledge of the costs of regulation on industry members in the past, appear well-reasoned.

    iii)    <u>*De minimis* exception</u>

The clubs also assert that APHIS failed to adequately explain why it defined the *de minimis* exception based on the number of breeding females on site, as opposed to the number of animals a breeder sells in a year. The clubs suggest that 50 or fewer pets sold per year would have been a better indication of a "small" breeder. But APHIS explained that it cannot require exempt sellers to keep records of their sales and thus it would have difficulty determining who actually sold fifty or fewer animals. Final Rule, 78 Fed. Reg. at 57,241, AR 389. During a single visit, on the other hand, an inspector can count how many breeding females a seller has. Impact Analysis, AR 461. This is an adequately reasoned justification for the *de minimis* exception.

C. Regulatory Flexibility Act

Finally, the clubs argue that APHIS's analysis of the adverse impact of the rule change violates the Regulatory Flexibility Act, 5 U.S.C. § 601, et seq. They contend that APHIS violated section 604 of that Act, which requires an agency promulgating a final rule to prepare a regulatory flexibility analysis stating the significant issues raised by public comments, an estimate of the number of small entities the rule will affect, and a description of the steps the agency has taken to minimize the economic effect on those entities. Id. §§ 604(a)(2), (4), (6). The Regulatory Flexibility Act's "requirements are '[p]urely procedural'" and only require the agency to describe the required topics. Nat'l Tel. Co-op. Ass'n v. FCC, 563 F.3d 536, 540 (D.C. Cir. 2009) (quoting U.S. Cellular Corp. v. FCC, 254 F.3d 78, 88 (D.C. Cir. 2001)). The clubs do not suggest that APHIS failed to address the required topics, but rather dispute the merits of the agency's analysis. See Pls.' Mem. at 27. The Regulatory Flexibility Act does not provide another forum for the clubs to chew over their substantive arguments. The APA governs the merits of the matter and, as established above, APHIS's reasonable construction of "retail pet store" keeps it out of the APA doghouse.

**IV.    Conclusion**

For reasons stated above, the Court will grant the Defendants' and Intervenor-Defendant's motions for summary judgment and deny the Plaintiffs' motion. The Court will issue an order consistent with this opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:    November 7, 2014

15